IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2022

IN RE ADDISYN P. ET AL.

Appeal from the Juvenile Court for Marshall County
No. 2019-JT-4            Lee Bussart, Judge
_____

No. M2021-00871-COA-R3-PT
_____

In this case involving termination of the father's parental rights to his children, the Marshall County Juvenile Court ("trial court") determined that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's parental rights was in the children's best interest. The father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Nicholas W. Utter, Lewisburg, Tennessee, for the appellant, Keith P.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

On October 4, 2019, the Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Keith P. ("Father") and Candice P. ("Mother") to their children, Addisyn P., Tristyn P., and Coletyn P. (collectively, "the Children"), who were ages seven, five, and two, respectively, at the time of the petition's

filing.[1]  In the petition, DCS averred that the Children were placed in the custody of the State on May 10, 2018, based on Mother's positive drug screen and her failure to comply with court-ordered services.  DCS stated that the trial court had previously entered a no-contact order concerning Father due to allegations that he had committed domestic violence against Mother in the Children's presence.  According to DCS, the parents also had previously stipulated that the Children were dependent and neglected due to educational neglect and exposure to domestic violence.  DCS averred that the Children had been in foster care continuously since they were removed from Mother's custody.

In support of the petition to terminate, DCS relied on the statutory grounds of (1) abandonment by failure to visit, (2) abandonment by failure to support, (3) abandonment by failure to provide a suitable home, (4) persistence of the conditions leading to the Children's removal, (5) failure to substantially comply with the requirements of the permanency plan, and (6) failure to manifest a willingness to assume legal and physical custody of or financial responsibility for the Children.  DCS also alleged that termination of Father's parental rights was in the best interest of the Children.  An amended petition was subsequently filed on February 7, 2020.

The record reflects that attorney Cindy Brown, guardian *ad litem* for the Children, had filed a dependency and neglect action concerning the Children on January 29, 2018, in the trial court.  In the petition, Ms. Brown asserted that Addisyn was suffering from educational neglect due to the fact that she had twenty-four unexcused absences from school during the first half of the 2017-2018 school year.  Ms. Brown also stated that Addisyn had witnessed domestic violence committed by Father against Mother.  The trial court conducted a hearing on March 19, 2018, and determined the Children to be dependent and neglected.  Although the Children were allowed to remain in Mother's custody at that time, with DCS services in the home, the trial court directed that Father would have no contact with the Children.

The trial court entered a protective custody order on May 10, 2018, placing the Children in the temporary custody of DCS.  The court stated that the basis for its order was Mother's failure to comply with court-ordered services and her positive drug screen. On May 21, 2018, the court entered an order allowing Father to participate in therapeutic supervised visitation with the Children.

On July 20, 2018, the trial court ratified a permanency plan concerning the Children that had been created in June 2018.  In this initial permanency plan, DCS noted concerns regarding, *inter alia*, the parents' drug use and domestic violence in the home. Father's specific requirements for compliance with the permanency plan included:  (1)

---

[1] Mother has not appealed the trial court's termination of her parental rights.  We will, therefore, confine our recitation of the facts and our analysis solely to the facts relevant to and the statutory grounds applicable to Father.

obtaining safe and stable housing and maintaining such housing for at least four months, (2) providing a transportation plan to DCS, (3) attending and completing the Batterer Intervention Program, (4) participating in individual and family therapy, (5) obtaining a mental health assessment, (6) signing a release so that DCS could obtain Father's mental health records from the United States Department of Veterans Affairs ("the VA"), (7) obtaining an alcohol/drug assessment and following all recommendations, (8) submitting to and passing random drug screens, (9) providing a list of all prescribed medications and taking those medications as prescribed, and (10) abiding by the rules of his probation and avoiding new criminal charges. Both Father and his counsel signed this permanency plan.

The trial court entered an order on September 7, 2018, stating that DCS had reported that Father had made no progress toward reunification with the Children. The court explained that visits had been suspended in July 2018 because both parents had reported contracting scabies and lice, although no medical documentation had been provided to DCS.

A subsequent permanency plan was developed on April 3, 2019, and ratified by the trial court on July 23, 2019. This plan contained largely the same requirements listed in the prior permanency plan; however, Father was also responsible for resolving his legal issues. This plan further added an alternative goal of adoption. Another permanency plan was developed on September 5, 2019, and was ratified by the trial court on October 10, 2019. Father's requirements under this plan remained substantially the same as listed in the previous plans. DCS's termination petition was subsequently filed on October 4, 2019, and amended on February 7, 2020.

The trial court conducted a bench trial with respect to the termination petition on April 16, 2020, and May 21, 2021. On July 2, 2021, the court entered an order terminating the parental rights of Father based on its determination that clear and convincing evidence supported the statutory grounds of (1) abandonment by failure to provide support, (2) abandonment by failure to provide a suitable home, (3) persistence of the conditions leading to the Children's removal, (4) failure to substantially comply with the requirements of the permanency plan, and (5) failure to manifest a willingness to assume legal and physical custody of or financial responsibility for the Children. The court further determined that clear and convincing evidence demonstrated that termination of Father's parental rights was in the Children's best interest. Father timely appealed.

## II. Issues Presented

Father presents the following issues for this Court's review, which we have restated slightly:

1.      Whether the trial court erred by determining that DCS proved statutory grounds for termination of Father's parental rights by clear and convincing evidence.

2.      Whether the trial court erred by determining that termination of Father's parental rights was in the Children's best interest.

### III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III,* 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)    Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

In its final order, the trial court concluded that clear and convincing evidence supported a finding of five statutory grounds to terminate Father's parental rights: (1) abandonment by failure to provide a suitable home, (2) abandonment by failure to provide support, (3) persistence of the conditions leading to the Children's removal, (4) failure to substantially comply with the requirements of the permanency plan, and (5) failure to manifest a willingness to assume legal and physical custody of or financial responsibility for the Children. We will address each statutory ground in turn.

## A.  Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (2021) provides as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (2017) in effect at the time the instant petition was filed provided the following definitions of abandonment as pertinent here:[2]

(ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed

---

[2] Effective March 6, 2020, the General Assembly has amended Tennessee Code Annotated § 36-1-102(A)(iv) in part to change the language regarding the time period prior to incarceration. *See* 2020 Tenn. Pub. Acts, Ch. 525, § 1 (S.B. 1769). However, inasmuch as the instant petition was filed prior to the effective date of the amendment, the prior version of the statute applies. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)   The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)   For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

* * *

(iv)   A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration

- 7 -

beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]

We will address each abandonment ground in turn.

### 1. Abandonment by Failure to Provide Suitable Home

The trial court determined that clear and convincing evidence supported the statutory ground of abandonment by failure to provide a suitable home. With respect to this ground, the trial court stated in its July 2, 2021 order:

The Court finds that there is uncontroverted proof that the children were removed from the parents on May 10, 2018 based upon a Petition filed in this Court alleging that the children were dependent and neglect[ed]. The Ex Parte Protective Custody Order found that the children's situation prevented the Department from making reasonable efforts to prevent the removal.

Based upon the uncontroverted testimony of FSW [family services worker] Gentry and the proof before the Court, the Court further finds that for a period of four months following the removal, the Department made reasonable efforts to assist [Father and Mother] to establish a suitable home for the children. FSW Gentry and Team Leader Fisher testified that the Department prepared permanency plans for [Father and Mother], setting out requirements in order to regain custody of the children. Further, the Department provided services to [Father and Mother] consistent with the permanency plans. The Department further provided necessary services for the children, including necessary medical and behavioral health services.

As set out above, at the permanency hearings the Court found that neither parent had resolved the issues which brought the children into custody, or provided any proof of completion of any of their responsibilities on the permanency plans. . . .

- 8 -

The Court finds that [Father and Mother] have failed to improve their homes and personal conditions so that the children could be returned to them, and that their failure to make even minimal efforts to improve their homes and personal conditions demonstrates a lack of concern for the children to such a degree that it appears unlikely that [Father and Mother] will be able to provide a suitable home for the children at an early date. The Court further finds that the efforts of the Department to assist [Father and Mother] in establishing a suitable home for the children were reasonable, in that they were equal to the efforts of [Father and Mother] toward establishing a suitable home, and that [Father and Mother] were aware that the children were in DCS custody.

DCS has proven, by clear and convincing evidence, the ground of abandonment by failure to provide a suitable home against [Father and Mother].

(Footnotes omitted.)

Upon our thorough review, we conclude that the evidence presented at trial supports the trial court's findings. The Children were removed from the home of the parents and from their custody on May 10, 2018, and placed in the custody of DCS following the filing of a petition alleging dependency and neglect. In its May 2018 order, the trial court determined that the Children's circumstances prevented further reasonable efforts from being made by DCS prior to removal.

Nevertheless, for more than four months thereafter, DCS made reasonable efforts to assist Father in establishing a suitable home for the Children. DCS established permanency plans for the Children, which outlined the requirements Father needed to satisfy in order to regain custody. DCS submitted a referral for a mental health evaluation for Father and requested that Father sign a release so that DCS could obtain his mental health records from the VA. Father refused to comply with either of these requested actions. DCS also offered a hair follicle drug screen, which Father refused.

Based on Father's need for safe and stable housing, DCS provided the parents with listings for affordable rental properties. When the parents obtained a residence, DCS performed a home visit to determine the suitability of the residence. DCS found the home to be appropriate; however, the parents moved from that home shortly thereafter due to an insect infestation.

DCS further provided for therapeutic supervised visits between Father and the Children. Although DCS offered thirty-six hours of visitation to Father from June 2018 to February 2019, Father only utilized twelve of those hours. Father was then re-

incarcerated in February 2019 and remained incarcerated at the time of the termination hearing.

As this Court has previously explained concerning the reasonable efforts analysis:

Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis. "Reasonable efforts" as defined by the legislature is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tennessee Code Annotated section 37-1-166(g)(1) (2003). However, the burden of family reunification does not lie entirely with DCS as reunification is a "two-way street."

*In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at \*9 (Tenn. Ct. App. Aug. 25, 2005) (other internal citations omitted). We conclude that the evidence preponderates in favor of a determination that DCS made reasonable efforts to assist Father in establishing a suitable home in the four months following removal of the Children.

The legislature has also stated that "efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal." *See* Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). During the approximately nine-month period following the Children's removal and prior to Father's re-incarceration, Father failed to demonstrate reciprocal efforts to improve his situation in order to provide a suitable home for the Children. Father did not comply with the requirements of the permanency plans. He never addressed his drug addiction or domestic violence issues, his lack of safe and stable housing, or his mental health needs. During trial, Father acknowledged that a practitioner at the VA had diagnosed him with post-traumatic stress disorder ("PTSD") and that he had self-medicated with illicit drugs rather than addressing his mental health issues. Father acknowledged that he had been suicidal at times and that he could not have provided care for the Children in 2018 and early 2019 due to his mental state and drug use.

Although Father acknowledged that he understood the requirements of the permanency plans, he expressed his disagreement with those requirements, stating essentially that he did not need to attend domestic violence classes because he had not been violent with Mother. Father admitted, however, that he had "pushed" Mother and had held her against a wall by her head and neck. Father remained incarcerated at the time of the termination trial, having violated his probation by using unlawful drugs. In Father's own words, he acknowledged that "getting my kids back in the next year or two will probably be a bad idea."

- 10 -

The evidence at trial clearly and convincingly demonstrated that Father was not able to establish a home to which the Children could safely return due to his incarceration, drug use, violent tendencies, and mental health issues. As such, Father demonstrated a lack of concern for the Children to such a degree that it appears unlikely that he will be able to provide a suitable home for the Children at an early date. We therefore conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of abandonment by failure to provide a suitable home.

2. Abandonment by Failure to Support

The trial court determined that clear and convincing evidence supported the statutory ground of abandonment by failure to support. With respect to this ground, the trial court stated in its July 2, 2021 order:

> From June 3 to October 3, 2019, [Mother] made no payments. From October 2018 - January 2019 (month prior to incarceration) no payments were received from [Father]. Although he was incarcerated, [Father] made one payment in March 2019.
>
> The Court finds that [Mother] and [Father] have abandoned these children in failing to support or make reasonable payments toward the support of the children for four (4) consecutive months immediately preceding the filing of the Department's Petition or prior to incarceration. Therefore, clear and convincing evidence of failure to support has been established.

The court also found that Father received monthly disability benefits from the VA.

The applicable version of the statute provided that the determinative period for abandonment by failure to support for an incarcerated parent was the "four (4) consecutive months immediately preceding such parent's or guardian's incarceration." *See* Tenn. Code Ann. § 36-1-102 (1)(A)(iv) (2017). Trial exhibits establish that Father's most recent incarceration had begun on February 11, 2019. As such, the relevant determinative period was October 11, 2018, through February 10, 2019, the day before Father was incarcerated. *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)).

It is undisputed that Father made no child support payments during this time period for two of the Children. However, trial exhibits demonstrate that Father did tender

- 11 -

one $400 payment for the third child in January 2019. The evidence also demonstrates that Father was not incarcerated during the determinative period and was receiving monthly disability benefits from the VA. This Court has previously considered a parent's disability benefits in the context of parental rights termination to find that a parent could have provided some amount of support for his child(ren). *See, e.g.*, *In re Kierani C.*, No. W2020-00850-COA-R3-PT, 2021 WL 4057222, at *12 (Tenn. Ct. App. Sept. 3, 2021); *In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *6 (Tenn. Ct. App. Aug. 30, 2017).

During trial, Father claimed that his disability benefits were in the amount of $2,000 per month. On his affidavit of indigency filed in February 2018, however, Father represented that such benefits were in the amount of $3,000 per month. Mother likewise testified that Father's disability benefits were in the amount of $3,200 to $3,500 per month.

Father asserted at trial and continues to posit on appeal that his failure to pay support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I) (2021) ("[I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence."). Father urges that he established this affirmative defense at trial through his testimony that he was released from incarceration in April 2018, was not employed during the months he was not incarcerated, and suffered a loss during the summer of 2018 when he was forced to move from his residence due to an insect infestation.

Although Father's testimony did establish these facts, we note that Father never claimed during his trial testimony that he lacked the ability to pay support for the Children. Father presented no evidence concerning his living expenses and admitted that he had income of at least $2,000 per month during the determinative period regardless of his employment status. Father also admitted to prolific use of illicit drugs during the determinative period. A parent's ability to procure illicit drugs has previously been considered by this Court as a factor demonstrating that parent's ability to pay child support. *See In re Daniel G.*, No. E2021-00188-COA-R3-PT, 2021 WL 5297698, at *17 (Tenn. Ct. App. Nov. 15, 2021); *In re E.S.L.*, No. E2015-01709-COA-R3-PT, 2016 WL 4532470, at *5 (Tenn. Ct. App. Aug. 29, 2016); *In re Autumn K.*, No. M2009-01579-COA-R3-PT, 2010 WL 702307, at *11 (Tenn. Ct. App. Mar. 1, 2010).

In addition, despite the trial court's finding that no support payments were made by Father during the determinative period, trial exhibits demonstrate that he paid a $400 child support payment in January 2019. This payment further demonstrates Father's ability to pay child support. As such, Father's asserted defense that his failure to support was not willful because he lacked the ability to pay was not proven by a preponderance of

the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I). Moreover, given Father's level of income, we determine this singular payment made during the determinative period to constitute token support. *See* Tenn. Code Ann. § 36-1-102(1)(B) (2021) (defining "token support" to mean "that the support, under the circumstances of the individual case, is insignificant given the parent's means").

Father postulates that this Court should consider the child support payments that he made during his incarceration but prior to the filing of the termination petition. However, Father cites no authority allowing this Court to consider payments made outside the determinative period set forth in the statute. We therefore conclude that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, that the statutory ground of abandonment by failure to support was proven as to Father.

### B. Persistence of Conditions

The trial court also found clear and convincing evidence supporting the ground of persistence of the conditions that led to removal of the Children from Father's home or physical or legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2021) provides:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)  The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final order, the trial court determined as follows concerning this ground:

The Court concludes by clear and convincing evidence that the children have been removed from the home or the physical or legal custody of [Mother] since May 10, 2018, as the result of a Petition filed in Juvenile Court alleging that the children were dependent and neglected. At the time of this hearing, the children have been removed for a period greater than six months. The Court further concludes that conditions continue to exist in the home which prevent the children's return to Mother and Father.

The Order which precipitated the removal of the children alleged that the children were dependent and neglected based upon drug exposed children. The conditions which led to the removal still persist.

Therefore, the Court finds that DCS has proven, by clear and convincing evidence, the ground of persistent conditions against [Mother and Father].

The evidence presented at trial preponderates in favor of these findings and determinations. Following the filing of a dependency and neglect petition, the Children were removed from the legal custody of Father and Mother on May 10, 2018, and placed in the custody of DCS. By the time the termination trial was conducted, the Children had been in DCS custody for almost three years.

The conditions leading to the Children's removal included domestic violence in the home, drug use by the parents, and educational neglect concerning Addisyn. By the time of trial, Father had not completed a treatment program for his substance abuse issues. Father had also failed to complete any domestic violence program. Instead, Father was reincarcerated in February 2019 and remained incarcerated at the time of trial.

Based on Father's incarceration and his lack of progress in dealing with his substance abuse and mental health issues, it is unlikely that the Children could be safely returned to Father in the near future. Father admitted as much during his trial testimony. As such, continuation of the parent/child relationship would greatly diminish the Children's chances of early integration into a safe, stable, and permanent home. The proof demonstrated that the Children were flourishing in the home of their foster parents ("Foster Parents"), who loved the Children and wished to adopt them.

- 14 -

Predicated upon the evidence presented at trial, we conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of persistence of the conditions leading to removal.

### C. Substantial Noncompliance with Permanency Plan Requirements

The trial court also determined that clear and convincing evidence supported the ground of substantial noncompliance by Father "with the statement of responsibilities in a permanency plan," pursuant to Tennessee Code Annotated § 36-1-113(g)(2) (2021). In its order, the trial court specifically found:

> There was uncontroverted testimony from FSW Gentry that the Department prepared multiple permanency plans for [Father and Mother], and that the responsibilities for [Father and Mother] were consistent on the plans. This Court has reviewed the plans, and made findings by preponderance of evidence during the dependency case that the requirements for [Father and Mother] were reasonable, reasonably related to the reasons for foster care, and that the plans were in the children's best interests. This Court makes the same finding today by clear and convincing evidence and further finds that had [Father and Mother] cooperated with the plans, it would have addressed the reasons for which the children w[ere] in DCS custody.

> The Court presented termination criterion provided on July 19, 2018. Specifically, Mother testified she understood failure to comply with the permanency plan could result in termination of parental rights.

> [Father] testified that he withheld his release of information because that was the only power he had, indicating he understood his obligations under the Permanency Plan and willfully failed to comply. [Father] participated in many Child Family Team Meetings. He testified that based on his diagnosis of Post Traumatic Stress Disorder, he has difficulty handling conflict and requested all communication be directed to his attorney on June 25, 2019.

> The Court finds neither Mother or Father successfully complied with their permanency plans. At this time, Father is incarcerated for his continued drug use. . . . Therefore, the Court finds that DCS has proven, by clear and convincing evidence, the ground of substantial noncompliance with the permanency plans against [Father and Mother].

Based upon our thorough review of the evidence presented in this matter, we agree with the trial court's findings and conclusions concerning this statutory ground as pertinent to Father.

In the initial permanency plan, DCS clearly set forth specific requirements for Father's compliance with the permanency plan, including: (1) obtaining safe and stable housing and maintaining such housing for at least four months, (2) providing a transportation plan to DCS, (3) attending and completing the Batterer Intervention Program, (4) participating in individual and family therapy, (5) obtaining a mental health assessment, (6) signing a release so that DCS could obtain Father's mental health records from the VA, (7) obtaining an alcohol/drug assessment and following all recommendations, (8) submitting to and passing random drug screens, (9) providing a list of all prescribed medications and taking those medications as prescribed, and (10) abiding by the rules of his probation and avoiding new criminal charges. These requirements were also incorporated into subsequent plans.

Father acknowledged at trial that he was aware of the permanency plans' requirements. However, Father made little to no progress toward the requirements during the three-year period that the Children remained in DCS custody. Although Father was incarcerated during a portion of that period, thereby limiting his available resources, the evidence demonstrated that during the nine-month period following the Children's removal and preceding Father's incarceration, he completed none of the action steps required by the permanency plan. He failed to establish and maintain a stable home, failed to complete the Batterer Intervention Program, failed to address his mental health needs or substance abuse issues, and ultimately had his probation revoked. As such, we conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of substantial noncompliance with the permanency plan requirements.

### D. Failure to Manifest a Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Children

The trial court determined that DCS presented clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (2021) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody or financial responsibility of the Children and (2) returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

In its July 2, 2021 order, the trial court found as follows concerning this statutory ground:

> The Court finds that [Father and Mother] have failed to manifest, by act or omission, an ability and a willingness to personally assume legal and physical custody of the children. There was uncontroverted proof that [Mother] has engaged in acts or omissions that show her failure to manifest an ability and willingness to personally assume legal and physical custody of the children, despite knowing that the children are in foster care, and each has chosen not to engage in services with the Department to change their situations so they could regain custody of the children. [Father and Mother] have not substantially completed any requirement of the permanency plans, including maintaining meaningful sobriety or obtaining a suitable home.
>
> The Court finds that [Father and Mother] have failed to manifest, by act or omission, an ability and a willingness to personally assume financial responsibility of the children, as demonstrated by their failures to provide any support for the children.
>
> The Court further finds that placing the children in [Father's and Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. In addition to the lack of progress, failure to complete any task on the permanency plan, and continued criminal activity, there was uncontroverted testimony from Brandee Lancaster of Junior's House, Lisa Fisher and Foster Mother that the children are doing well in their foster home, and that it would be detrimental to the children to be moved. [The foster mother] testified that Coletyn does not have any type of relationship with [Father and Mother] and doesn't even know who they are. The children appear healthy and well cared for. [Foster Parents] are committed to the children and want to adopt them. Based on photographs, the children interact well with each other and other family.

The Court finds that the current placement with [Foster Parents] supports the children's emotional, psychological and medical needs. It is this Court's opinion that the children's relationship with [Foster Parents] is a meaningful family relationship and it would be detrimental to the children to disturb this bond.

(Footnote omitted.) The evidence supports these findings as pertinent to Father.

At the time of trial, Father was incarcerated. No evidence was presented concerning Father's projected release date. Father also had not sufficiently addressed his substance abuse, domestic violence, or mental health issues. Father presented no proof demonstrating that he would be able to provide a safe and stable home for the Children even if he were not incarcerated. As such, Father had no ability to assume custody of the Children.

Although DCS needed to prove only Father's failure to manifest an ability or his failure to manifest a willingness as it relates to this ground, we likewise conclude that Father also lacked the willingness to assume legal and physical custody of or financial responsibility for the Children. *See In re Neveah M.*, 614 S.W.3d at 677 ("If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied."). We recognize Father's testimony at trial that he loved the Children and did not want to lose his parental rights. However, as this Court has previously explained:

When evaluating willingness, we look for more than mere words. Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.

*In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (internal citations omitted).

Father's actions spanning the nearly three years that had elapsed since the Children's removal by the time of trial established that Father had failed to manifest a willingness to regain custody of the Children. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) (finding that a parent had failed to manifest a willingness to assume custody because, *inter alia*, she "was incarcerated and had completed virtually none of her plan responsibilities" by the time of trial); *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018) ("Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child.").

- 18 -

Since the Children were removed in May 2018, Father's actions reflected a lack of concern for the Children and a lack of willingness to assume legal and physical custody of or financial responsibility for the Children. When Father was not incarcerated, he did not complete any of the requirements of the permanency plans and failed to address even the most basic needs of maintaining a stable residence, maintaining contact with DCS, participating in consistent visitation, and addressing his substance abuse and mental health issues. Instead, Father continued to use illicit drugs and refused to cooperate with DCS at every turn. Father's actions evinced that he was not willing to overcome major obstacles to regaining custody. We therefore determine that the evidence supported the trial court's findings concerning Father's failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Children.

Moreover, we further determine that the evidence preponderated in favor of the trial court's finding that placing the Children in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. As the trial court noted, in addition to Father's lack of progress toward providing a safe and stable home for the Children, the evidence was also clear that the Children were thriving in the care of Foster Parents and that removing them from that environment would be "devastating." The proof demonstrated that Addisyn had completed two years of trauma therapy and had learned to deal with her anger at and fear of Father, although she still expressed the desire that she not be placed in his custody. The younger children, who were two years old and ten months old, respectively, at the time they were removed, had no meaningful bond with Father, and proof was presented that they did not know who Father was. Multiple witnesses testified that the Children were happy, healthy, and thriving in the care of Foster Parents, who loved them and wished to adopt them. By contrast, Father had failed for a period of three years to take any significant steps toward regaining custody or being able to provide a safe home to which the Children could return.

Based upon Father's history of mental health issues, violence, and drug use, placing the Children in his custody would clearly pose a risk of substantial harm to their physical and psychological welfare. We therefore conclude that the trial court properly determined that clear and convincing evidence supported the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children.

V. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182

- 19 -

S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the termination petition was filed in the instant action listed the following factors for consideration:[3]

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[3] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d at 732.

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has instructed regarding the best interest analysis:

> "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].
>
> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the

child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  In re Audrey S., 182 S.W.3d at 878.  And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case.  See In re Audrey S., 182 S.W.3d at 878.  Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.  In re Carrington H., 483 S.W.3d at 523.  "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."  In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194).  But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof.  Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In considering the best interest factors, the trial court found concerning both parents:

The Court concludes that Tenn. Code Ann. § 36-1-113(i)(2) is present in that [Mother] has not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonabl[y] appear possible.  [Father] is currently incarcerated; therefore, [Father] has not made such an adjustment of circumstance, conduct or conditions as to make it safe and in the children's best interest to be in his home despite reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonabl[y] appear possible.

- 22 -

There was uncontroverted testimony from FSW Gentry and Team Leader Fisher that the Department attempted to assist [Mother] to remedy the situation that brought the children into foster care, appropriate referrals were made and utilized. Nonetheless, [Mother] has not complied with those services, and as a result she has not been successful in maintaining her sobriety or obtaining the security and stability necessary to support the children. The Court is truly encouraged by the progress shown by Mother in the last few months; nonetheless, her significant delay in seeking treatment and achieving sobriety was of unreasonable duration. Therefore, the Court finds that this factor weighs in favor of termination.

The Court finds that § 36-1-113(i)(4) is present in that there is no meaningful relationship between the parents and the children. The testimony of Brandee Lancaster demonstrated the significant trauma endured by this family. The relationship with the birth parents, particularly for Addisyn, is a painful one. This factor weighs heavily in favor of termination.

The Court finds that . . . Tenn. Code Ann. § 36-1-113(i)(5) is present in that a change of caregivers at this stage of the children's lives would have a detrimental effect on the children. The Court finds that any change of caregivers resulting in a return to Mother would have a detrimental effect on the children as there was uncontroverted testimony from [Mother] that she does not currently have a suitable home and [Father] is currently incarcerated and otherwise not stable. Despite completing alcohol and drug treatment and maintaining sobriety recently, Mother's delay in achieving her stability and the fragility of her housing situation does not make reuniting with her children safe. The Court further finds that a change of caregivers would also be detrimental to the children if they were to leave [Foster Parents'] home, which the Court finds to be the only meaningful relationships that the children have, and that the children are extremely well-cared for in [Foster Parents'] home. This factor weighs in favor of termination.

The Court finds that Tenn. Code Ann. § 36-1-113(i)(6) is present in that [Mother] has shown neglect towards the children as evidenced by her exposure of the children to drug use, and by failing to provide them a suitable home. This factor weighs in favor of termination.

The Court finds that Tenn. Code Ann. § 36-1-113(i)(7) is present in that the physical environment of [Mother's] home is not healthy and safe for the children. The Court finds that [the paternal grandmother's] home does not offer sufficient support for the children based on their need for

protection from further trauma; therefore, the Court cannot consider that Mother has a physical environment that is healthy and safe for the children. Further, Mother has not demonstrated an ability to protect the children from abusive circumstances and inappropriate household members. This factor weighs in favor of termination.

Further, the Court concludes that termination of [Mother's] parental rights is in the best interests of the children because [Mother] has received appropriate referrals and appropriate treatment, yet she has been unable to change her circumstances to provide stability for the children. Although she is in a much stronger position than she was six months ago, she is still not in a position to parent.

Further, the Court concludes that termination of [Father's] parental rights is in the best interests of the children because [Father] has received appropriate referrals and appropriate treatment, yet he has been unable to change his circumstances to provide stability for the children.

The court also noted that evidence demonstrated that the Children had developed a strong bond with Foster Parents, who wished to adopt the Children.

Upon our thorough review of the evidence presented in this matter, we determine that the trial court's findings concerning the statutory best interest factors are supported by a preponderance of the evidence. With regard to the first factor, Father had made no adjustment to his circumstances, conduct, or conditions by the time of trial so as to make it safe or in the Children's best interest to be in his home. Father was incarcerated and had failed to comply with the permanency plan requirements, which were reasonably related to remedying the conditions leading to the Children's removal. Likewise, with regard to the second factor, Father had failed to effect a lasting change despite reasonable efforts by DCS to assist him. Considering especially that three years had passed in the interim, we find it unlikely that change would occur.

Concerning the third factor, Father had not maintained consistent visitation with the Children, having only utilized one-third of the hours offered to him before he was reincarcerated. Because of this, Father had no meaningful relationship with the Children in accordance with factor four. The evidence demonstrated that Addisyn had expressed a continuing fear of Father and that the younger children did not know him.

With regard to the fifth factor, multiple witnesses testified that removing the Children from Foster Parents' home would be detrimental to their emotional and psychological health. The Children were thriving with Foster Parents, had bonded with them as a family, and referred to Foster Parents as "Mom" and "Dad." The Children were happy, and Addisyn was performing well in school. The Children's mental and

physical health had improved since being placed with Foster Parents. Significant evidence existed demonstrating that removing the Children from that home would have a devastating impact on them. The Children's foster mother, who was also their maternal aunt, described the Children as "energetic and fun" and explained that they had overcome the trauma to which Father had subjected them through therapy and a loving and stable environment. Addisyn's therapist described her relationship with Foster Parents as loving and healthy.

Respecting factor six, Father had committed domestic violence toward Mother while the Children were present, resulting in trauma to the Children. Mother testified at trial concerning Father's violent acts toward her, which included choking her until she blacked out and holding a knife to her throat. Mother testified that one episode of violence became so prolonged and traumatic that she asked Father to allow her to lock the Children in a closet so they would no longer be forced to witness it. Moreover, when the Children lived with Father, they were also subjected to his illicit drug use, which would impact consideration of factor seven. With regard to factor eight, Father's mental health issues also had been detrimental to the Children and, inasmuch as Father had never sufficiently addressed those issues, would prevent Father from effectively parenting the Children in the future. Father's mental health appeared to be reflected in his somewhat bizarre trial testimony, wherein he acknowledged telepathic communications and described himself as being held "hostage" and the victim of "domestic terrorism."

Finally, concerning factor nine, Father failed to pay consistent child support for the Children, having tendered only one payment during the determinative period even though he received regular income via his disability benefits. In sum, based on our careful review of the evidence, we conclude that clear and convincing evidence supported the trial court's determination that termination of Father's parental rights was in the best interest of the Children.

## VI. Conclusion

For the foregoing reasons, we conclude that the trial court's judgment terminating Father's parental rights to the Children should be affirmed in its entirety. Costs on appeal are assessed to the appellant, Keith P. This case is remanded to the trial court for collection of costs assessed below.

s/Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE